# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  49887-1-II |
| Respondent, | |
| v. | |
| ERIC KERMIT JACOBSON, | UNPUBLISHED OPINION |
| Appellant. | |

WORSWICK, J. — Eric Kermit Jacobson appeals his convictions and sentence for one count of attempted first degree rape of a child and one count of attempted commercial sexual abuse of a minor.  Jacobson argues that (1) law enforcement's conduct was so outrageous that it violated his due process rights, (2) the prosecutor committed misconduct throughout trial, (3) cumulative error deprived him of a fair trial, (4) substantial evidence does not support his convictions, and (5) the community custody conditions prohibiting the use of the Internet and devices with Internet access violate his First Amendment rights.  We affirm Jacobson's convictions and sentence.

## FACTS

### I. BACKGROUND

The Washington State Patrol Missing and Exploited Children's Task Force (Task Force) investigates sex crimes against children, and the majority of the Task Force's investigations involve the Internet.  Detective Sergeant Carlos Rodriguez manages the Task Force and oversees its undercover operations.  In December 2015, the Task Force conducted an undercover

operation in Pierce County. As part of the undercover operation, the Task Force posted ads on the "Casual Encounters" section of Craigslist,[1] posing either as children seeking sex or parents seeking for others to have sexual contact with their children. 1 Verbatim Report of Proceedings (VRP) 140.

On December 14, 2015, Sergeant Rodriguez posted an ad on the Casual Encounters section, posing as Kristl, a single mother with three minor children. The ad was entitled "young family fun, no RP lets meet" and read "looking for a crazy fun time. only serious need respond. no solicitations. single mom with 2 daus and 1 son."[2] Ex. 1. Soon after, Kristl[3] received an e-mail response from "John Tepinen," stating that he was interested in "some play with one or both of [Kristl's] daughters." Ex. 2, at 1.

Kristl and John began exchanging text messages. Kristl stated that her daughters were "11 nearly 12 and 8." Ex. 4, at 1. John stated that he was interested in Kristl's older daughter and asked for several pictures of her. Sergeant Rodriguez obtained photographs from State Trooper Anna Gasser that were taken at the time she was approximately 16 years old and sent the photographs to John. Trooper Gasser portrayed Lisa, Kristl's 11-year-old daughter, throughout the undercover operation. John then asked if Kristl would send a picture of herself. United States Postal Inspection Service Inspector Samantha Knoll portrayed Kristl throughout the undercover operation. John and Kristl then exchanged pictures of each other.

---

[1] Craigslist is an online classified advertisement website.

[2] Sergeant Rodriguez stated that "[no] RP" meant no role play. 1 VRP at 151.

[3] We refer to all law enforcement as their undercover personas for clarity.

The next day, John stated, "I believed we were talking about Lisa being ready to go all the way, and if she is and you are comfortable with that then I would like to help with that." Ex. 4, at 5. Kristl asked if John was okay with bringing gifts and stated that "roses are always good, she likes gift cards, tracfone minutes for her phone, stuff like that." Ex. 4, at 7. John responded in the affirmative. John then stated he was interested in oral sex with Lisa. Later that day, John spoke on the phone with both Kristl and Lisa.

Kristl and John arranged to meet the following day at a gas station. Kristl asked that John bring condoms, lubricant, and candy to meet Lisa. John requested that Kristl bring Lisa to the gas station so that he could see that Kristl and Lisa were real people. Then, the following exchange took place:

> [KRISTL]: no way. sorry hun. this is too risky for us. [nevermind] then i have a system and im sticking to it.
> [JOHN]: I'm sure you fill up at that station all the time . . . you have to respect that I need to feel safe too . . . I certainly respect that you do . . . .
> [KRISTL]: so have a great life. like i said. i have a system and it has kept me out of trouble. i will not change.
> [JOHN]: Ok.
> [KRISTL]: so that means no go right?
> . . . .
> [JOHN]: I just drove by the address you gave me for the [gas station], and you gave me the address to a home residential neighborhood. So sorry, this is all seeming to be something it's really not.
> . . . .
> [KRISTL]: im done with you sorry to mich hassle if you change your mind you know what to do
> [JOHN]: They wind up having time tomorrow during the day, may I message you? Would you be available daytime tomorrow? . . .
> [KRISTL]: no way. yo know what the deal is i will find someone else
> [JOHN]: Ok.
> [KRISTL]: im [upset] with you [now] i have to tell her you arent coming. I [shouldn't] have let her [talk] to you
> [JOHN]: Ugh . . . I feel bad. Would there be any harm in me coming over tonight still?
> . . . .

3

> [KRISTL]: are you still good with gifts? . . . what did [you] have in mind . . . .
> [JOHN]: A gift card, that can be used for any purpose.

Ex. 4, at 10-14.

John notified Kristl that he was at the agreed upon gas station in a silver sport-utility vehicle (SUV). Kristl then provided the address for the undercover operation's "trap house." Soon after, law enforcement initiated a traffic stop of the silver SUV. Law enforcement identified Jacobson as the driver of the vehicle and placed him under arrest. Pursuant to a search incident to arrest, law enforcement located condoms, lubricant, and candy on Jacobson's person. Law enforcement also located a cell phone in the silver SUV and verified that the cell phone belonged to Jacobson and was the same cell phone number John had used to contact Kristl. The State subsequently charged Jacobson with one count of attempted first degree rape of a child[4] and one count of attempted commercial sexual abuse of a minor.[5]

## II. TRIAL

The case proceeded to a jury trial. During voir dire, the following exchange took place:

> [THE STATE]: . . . has anyone been into the Casual Encounter section of Craigslist? . . .
>    . . . .
> [THE STATE]: . . . I am going to ask some questions about the Casual Encounter section of Craigslist which for those of you who have never heard of it has dating services, sex services, nudity, all kinds of stuff.

1 VRP at 11-12. Jacobson did not object.

The prosecutor continued:

> What would you expect when you hear the name Casual Encounters? Sound permanent? . . . Were you aware that you could find sex for sale on that website?

---

[4] RCW 9A.44.073(1).

[5] Former RCW 9.68A.100(1) (2013).

. . . .

. . . Anyone surprised or not surprised to know that you can actually pay for sex or, for that matter, get paid for sex on Craigslist?

1 VRP at 14-15. Jacobson did not object.

The prosecutor also asked the prospective jurors if "anybody ever . . . actually been on Backpage.com? Heard of it? How many of you were aware of the recent news story that the CEO [(chief executive officer)] of Backpage was just arrested for running the largest online brothel in the world?" 1 VRP at 15. Jacobson did not object. The prosecutor then referenced Craigslist, asking: "Does anybody know what happens when you flag the ad?" 1 VRP at 18. A prospective juror responded that when an ad is flagged, Craigslist will occasionally take it off of its website. The prosecutor continued: "Someone out there in the Internet reads the ad and decides whether or not [the] complaint was legit. If it is, the ad is gone, and if it's not, it stays up." 1 VRP at 18. Jacobson did not object.

The prosecutor also referenced "*To Catch a Predator*." *See* 1 VRP at 22. The prosecutor asked, "How many of you watch shows like 20/20 and Dateline, those kind of things? . . . [D]id you ever watch the ones, *To Catch a Predator*, the stings that were done?" 1 VRP at 22. The prosecutor continued:

> *To Catch a Predator*, those kind of things, how many of you have watched the shows where they set somebody up; they show up, and it's the police and they are arrested? . . . Has anybody here ever seen one of those and thought to themselves, "God, I feel bad for that guy?"

1 VRP at 22. Jacobson did not object.

Later, the prosecutor asked:

> [THE STATE]: How many of you have actually sat on a jury that went all the way to the deliberations before?
> . . . .

5

[THE STATE]: Has anyone sat on a jury that deliberated but then was not able to reach a verdict, so it was a hung jury? [Prospective juror]?

PROSPECTIVE JUROR: Yes.

[THE STATE]: Frustrating?

PROSPECTIVE JUROR: Yes. . . .

. . . .

[THE STATE]: The goal of picking a jury is to try to pick a jury that's going to get along well enough to reach a unanimous decision. . . . So when [defense counsel] asks you at the end if there is anything we need to know about you, that kind of question, is there anybody here who doesn't play well with others that wants to admit it?

1 VRP at 54-55. Jacobson did not object.

The prosecutor continued:

What strikes me as one of my difficulties in this particular case is, is that—so one of the things I intend to do during this case is to present a detective who is going to walk people through the Craigslist Casual Encounter section, and I assure you it's going to be eyeopening. But I also am not surprised at all that not one person in here raised their hand when I said, "Have you been on the Casual Encounter section?" Because if you have, you are not going to raise your hand in a group full of people, especially that are all strangers, and say, "You know what? I saw a whole bunch of naked people who are offering sex for money, and oh, by the way, they were offering kids for sale, too," because it's kind of difficult to explain what you were doing there, right?

I mean, it's not like you just happened to . . . . This is casual encounters where you have to click and it actually says, "Are you over 18 to go in here?" . . .

. . . .

. . . I am telling you, you have to say, "Yes, I am over 18." And you know how you do that? Click. And it's just that simple. So I guess then here—so here is the question: How do I find the people, the person, if there is any, the people who have been on the Casual Encounter section of Craigslist and don't want to talk about it? How do I do that?

1 VRP at 59-60. Jacobson did not object.

During opening argument, the prosecutor provided:

The advertisements that [the Task Force is] using now are on Craigslist, and they are in the Casual Encounter section. . . .

The Casual Encounter section of Craigslist is filth like almost no other. . . .

. . . .

6

Sergeant Rodriguez will tell you about some of the advertisements that they have come across when they do these operations because not only does Sergeant Rodriguez post the advertisements, but while he is responding to people who are responding to him, he is also looking up other ads, people who are offering up children, people who are offering up acts of bestiality, with animals, people offering up all kinds of stuff you cannot believe, and the filthier the better in some respects. And you'll see, as Sergeant Rodriguez walks you through Craigslist, the different type of advertisements.

1 VRP at 120-21. Jacobson did not object.

Later during opening argument, the prosecutor stated, "I am going to also apologize in advance for some of the evidence and some of the things you are going to see in this case because they are offensive content. Unfortunately, it's the defendant's actions that are bringing us here today." 1 VRP at 125-26. Jacobson did not object.

Witnesses testified to the above facts during the trial. Jacobson also testified, stating that he believed that he was arranging to meet with Kristl, an adult woman, who would portray an 11-year-old girl. During the prosecutor's direct examination of Sergeant Rodriguez, the following exchange took place:

> [THE STATE]: What is the purpose in general of the . . . Task Force with the State Patrol?
> [SERGEANT RODRIGUEZ]: So the purpose is to investigate cases dealing with child exploitation, to recover children—basically, keep people from doing harm to children.
> . . . .
> [THE STATE]: So in the [undercover operation], are you—are officers playing the roles of children?
> [SERGEANT RODRIGUEZ]: Yes.
> [THE STATE]: How is that helping to protect the children in general?
> [SERGEANT RODRIGUEZ]: Because when people are showing up to do something to a child, that's a child that they are not—you are keeping them from doing that to a child. In these operations, we have also identified or removed 18 kids. We have located children through these operations.

1 VRP at 132-33. Jacobson did not object.

7

The prosecutor continued:

> [THE STATE]: By the way, are the [undercover operations] going to continue into next year?
> [SEARGEANT RODRIGUEZ]: They will continue as long as I can do them.
> [THE STATE]: Are you planning to do more of them?
> [SERGEANT RODRIGUEZ]: Yes.
> [THE STATE]: Have they been successful in what you've been intending to do with them?
> [SERGEANT RODRIGUEZ]: Absolutely.

2 VRP at 390. Jacobson did not object.

During closing argument, the prosecutor stated,

> Let me say at the outset of this that I am going to use the word "I" multiple times in this closing argument. It is not my personal opinion. My personal opinion has no place in this case. So when I use the word "I," I am not telling you what to think. I am telling you what the evidence shows and what the law shows.

5 VRP at 780. The prosecutor continued:

> Rape of a Child First Degree, the completed crime, requires sex, and by that I mean sexual intercourse with a child under 12 not married to the defendant and more than 24 months younger.
> Commercial Sex Abuse of a Minor requires sexual conduct with a minor for a fee. So there is a lot of overlap between the two crimes. The age of the child; under 12 is a minor. Sexual contact, as you've just heard from the judge, is—sexual conduct is described as sexual intercourse or sexual contact. . . .
> Both of those two things, sexual intercourse and sexual contact, equal sexual conduct. So the only difference really between the completed crime is the element of "for a fee."

5 VRP at 781. Jacobson did not object.

The prosecutor then described the elements of attempt:

> So attempt to commit a crime, I am going to talk about those crimes again together because the elements are so similar. . . .
> One of those elements isn't or shouldn't be disputed, and that is the element of a substantial step. . . .
> . . . .
> If you put it in real-world terms, since none of you have been in a scenario like this defendant was in, if you put it in real-world terms, if you get together with

your spouse or your children and you talk about going to a movie and you decide what movie you're going to go to, what theater you're going to go to, what time the movie is going to be, and then you get in your car and you drive to the movie; you have your money; you get some candy because you are not going to pay that kind of price at the movie theater and it's in your pocket; you get to the movie theater and the phone rings and you get called away and you can't go, did you intend to see a movie? That's what the law criminalizes in the attempted commission of a crime, a substantial step.

5 VRP at 782-84. Jacobson did not object.

The prosecutor then discussed the evidence presented at trial:

And [the crime] was completed when [Jacobson] left the gas station and drove on his way to the residence before getting pulled over.

The only reason that he got pulled over before he got to the house and walked in—because you heard Sergeant Rodriguez talk about, "We let them in with the undercover officer, tell them to take their shoes off, and we arrest them and we videotape that."

That couldn't happen in this case because there wasn't a little girl, and this defendant was cautious. This defendant wanted to put eyes on that little girl. And the officers weren't going to take a chance of him pulling into Yakima Street, [Knoll] going outside without a child and having him take off and get into a more dangerous situation.

5 VRP at 784. Jacobson did not object.

The prosecutor continued:

So what is important in this case is, what did the defendant know when he was having his conversations and when he drove over to this house?

A lot of our law is a gray area. There aren't many things that are black or white, one or the other, but I am going to suggest to you that there is one thing that is black and white, and that's this: An adult will either have sex with a child or will not. There isn't any gray area there. An adult either will or will not.

And I am going to go a little bit further than that and say that an adult that is willing to talk about having sex with a child falls into the category of an adult who will because there isn't any adult in our society to whom the idea of sex with a child is repulsive, who will talk about having sex with a child. That doesn't happen in the real world.

This defendant clearly was willing to talk about having sex with a child. He pursued that topic over the course of three dates. He saw it out and then he drove to the place where he thought it was going to happen, and that's what makes him guilty of both of these crimes.

5 VRP at 786-87.  Jacobson did not object.

Then, the prosecutor commented on Jacobson's defense:

> It wasn't enough for the defendant that he got a picture of Lisa.  He then asked—and I am going to suggest to you that when the defendant's cross-examination went worse for him was when he tried to explain to you why he needed a picture of the mom and the girl together because if the mom is pretending to be the girl, that's not possible. . . .
>
> He then wanted the girl brought to the gas station with the mother so he could put eyes on them and determine they were real.
>
> I am going to suggest to you that the defendant's explanation of what "no RP" means was a couple of other initials, one of which is a B.  But you know what?  BS.  It's not possible that "no RP" means no real person.
>
> . . . .
>
> But the point is that the no RP, the no real people, the no role play, all of that is a sidetrack to what was actually going on here because the defendant's words and actions are what demonstrated his intent.

5 VRP at 791-92.  Jacobson did not object.

The prosecutor also discussed the potential bias of the testifying witnesses:

> [THE STATE]:  I am going to suggest to you—one of the things the judge read you was an instruction that said you can consider any interest, bias or prejudice. . . . I would suggest that you apply that standard to the defendant particularly.  Because if there is anyone who has an interest in the outcome of this case, it's him.
>
> [JACOBSON]:  Objection, Your Honor.  Objection to the statement of "particularly to the defendant."
>
> [THE STATE]: . . . I will clarify that.
>
> THE COURT:  Sustained. . . .
>
> [THE STATE]: I am not saying weigh his testimony differently.  I am encouraging you, asking you to apply the same standard you applied to [the law enforcement witnesses].  Apply the same exact standard.
>
> Ask yourself, what interest do they have in the outcome of this case?  What bias?  What prejudice?  You've heard that they have done five or six operations and dealt with hundreds of these people and arrested 60-plus.  What interest do they have in this particular case above any other case that they have investigated?  What interest does [Jacobson] have?  And why does he tell you folks a story that is 180 degrees different from what he said in the undercover capacity of the chats?  And why is it completely different than what he told the detective?  Why?  It's because his testimony was not true.

5 VRP at 798-99. Jacobson did not object.

During rebuttal argument, the prosecutor stated:

> [THE STATE]: [Jacobson] decided to have sex with an 11-year-old girl, and he decided he was going to pay for it to accomplish it. And now it's up to you folks to hold him responsible for what he did.
> [JACOBSON]: Objection. That's not what they are supposed to be doing.
> THE COURT: Overruled. . . .
> [THE STATE]: When the evidence is there, beyond a reasonable doubt, the just verdict is also what holds the defendant responsible and that's a verdict of guilty as charged.

5 VRP at 829. Jacobson did not object to the prosecutor's last statement. The jury found

Jacobson guilty as charged.

### III. SENTENCING

At sentencing, the trial court imposed an indeterminate sentence with a minimum term of

85 months and lifetime community custody for Jacobson's attempted first degree rape of a child

conviction. The court also sentenced Jacobson to 20.25 months of incarceration and 36 months

of community custody for the attempted commercial sexual abuse of a minor conviction to run

concurrently with the sentence on the attempted rape conviction.

As a condition of community custody, the trial court ordered "[n]o internet access or use,

including email, without the prior approval of the supervising CCO [(community custody

officer)]." Suppl. Clerk's Papers (CP) at 88. The trial court also ordered:

> No use of a computer, phone, or computer-related device with access to the Internet or on-line computer service except as necessary for employment purposes (including job searches). The CCO is permitted to make random searches of any computer, phone or computer-related device to which the defendant has access to monitor compliance with this condition.

Suppl. CP at 88. Jacobson appeals.

11

ANALYSIS

Jacobson argues that law enforcement's conduct during its undercover Craigslist operation was so outrageous that it violated his due process rights, the prosecutor committed misconduct throughout trial, cumulative error deprived him of a fair trial, substantial evidence does not support his convictions for attempted first degree rape of a child and attempted commercial sexual abuse of a minor, and the community custody conditions prohibiting the use of the Internet and devices with Internet access violate his First Amendment rights. We disagree.

I. OUTRAGEOUS CONDUCT

Jacobson argues that law enforcement's conduct during its undercover Craigslist operation was so outrageous that it violated his right to due process under the Fifth and Fourteenth Amendments of the federal constitution. We disagree.

The concept of outrageous conduct is founded on the principle that "the conduct of law enforcement . . . may be 'so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.'" *State v. Lively*, 130 Wn.2d 1, 19, 921 P.2d 1035 (1996) (quoting *United States v. Russell*, 411 U.S. 423, 431-32, 93 S. Ct. 1637, 36 L. Ed. 2d 366 (1973)). Whether law enforcement has engaged in outrageous conduct is a question of law that we review de novo. 130 Wn.2d at 19; *see State v. Mullin-Coston*, 152 Wn.2d 107, 114, 95 P.3d 321 (2004).

To determine whether law enforcement's conduct violated due process, we must assess the conduct based on the totality of the circumstances. *Lively*, 130 Wn.2d at 21. Law enforcement's conduct is outrageous and violates due process only when the conduct is so shocking that it violates fundamental fairness and the universal sense of fairness. 130 Wn.2d at

19. A claim based on outrageous conduct requires the defendant to demonstrate more than mere flagrant law enforcement conduct. 130 Wn.2d at 20. "Public policy allows for some deceitful conduct and violation of criminal laws by [law enforcement] in order to detect and eliminate criminal activity." 130 Wn.2d at 20. Outrageous conduct is not to be invoked each time law enforcement acts deceptively. 130 Wn.2d at 20. Instead, dismissal based on outrageous law enforcement conduct is reserved for only the most egregious circumstances. 130 Wn.2d at 20.

In evaluating whether law enforcement's conduct violated due process, we consider several factors, including: (1) "whether [law enforcement's] conduct instigated a crime or merely infiltrated ongoing criminal activity"; (2) "whether the defendant's reluctance to commit a crime was overcome by pleas of sympathy, promises of excessive profits, or persistent solicitation"; (3) "whether [law enforcement] controls the criminal activity or simply allows for the criminal activity to occur"; (4) "whether [law enforcement's] motive was to prevent crime or protect the public"; and (5)"whether [law enforcement's] conduct itself amounted to criminal activity or conduct 'repugnant to a sense of justice.'" 130 Wn.2d at 22 (citations omitted) (quoting *People v. Isaacson*, 44 N.Y.2d 511, 521, 406 N.Y.S.2d 714, 378 N.E.2d 78 (1978)).

Here, law enforcement posted an ad on Craiglist, posing as Kristl, a mother with three minor children. Jacobson responded to the ad that same day and expressed an interest in Kristl's 11-year-old daughter, Lisa. Jacobson stated that he was interested in both oral and vaginal sex with Lisa. Kristl asked if Jacobson could bring gifts when he met with Lisa, and Jacobson answered in the affirmative.

Later, the following exchange took place:

13

[JACOBSON]: I just drove by the address you gave me for the [gas station], and you gave me the address to a home residential neighborhood. So sorry, this is all seeming to be something it's really not.

. . . .

[KRISTL]: im done with you sorry to mich hassle if you change your mind you know what to do

[JACOBSON]: They wind up having time tomorrow during the day, may I message you? Would you be available daytime tomorrow? . . .

[KRISTL]: no way. yo know what the deal is i will find someone else

[JACOBSON]: Ok.

[KRISTL]: im [upset] with you [now] i have to tell her you arent coming. I [shouldn't] have let her [talk] to you

[JACOBSON]: Ugh . . . I feel bad. Would there be any harm in me coming over tonight still?

. . . .

[KRISTL]: are you still good with gifts? . . . what did [you] have in mind . . . .

[JOHN]: A gift card, that can be used for any purpose.

Ex. 4, at 11-14. Undercover officers portrayed Lisa and Kristl throughout the operation, and Jacobson spoke with both officers.

Looking to the totality of the circumstances, Jacobson fails to show that law enforcement's conduct during the undercover Craigslist operation was so outrageous that it violated due process. Although law enforcement initially posted the Craigslist ad, law enforcement's ad merely infiltrated ongoing criminal activity and did not instigate it. Instead, Jacobson instigated criminal activity by responding to the ad and requesting sexual contact with a child. In addition, law enforcement did not engage in criminal conduct during the undercover operation. Rather, law enforcement acted deceptively—posing as a mother who sought compensation for Jacobson's sexual contact with her 11-year-old daughter. Moreover, law enforcement did not control the criminal activity and instead allowed criminal activity to occur.

Jacobson initiated discussions about the crime, controlled the extent of the crime, and arranged for the crime to take place. Although Jacobson appeared reluctant to meet Kristl at the

gas station when he drove to an incorrect address, law enforcement did not overcome Jacobson's reluctance with pleas of sympathy or persistent solicitation. Jacobson was the first to mention meeting with Kristl and Lisa the following day. Law enforcement's message that "im upset with you [now] I have to tell her you arent coming," did not serve to overcome any reluctance—Jacobson had already initiated continuing the criminal activity. Ex. 4, at 11. Accordingly, viewing the totality of the circumstances, law enforcement's conduct during the undercover operation was not so shocking that it violated fundamental fairness and the universal sense of fairness. Thus, law enforcement's conduct did not violate due process.

## II. PROSECUTORIAL MISCONDUCT

Jacobson also argues that the prosecutor committed misconduct by vouching for law enforcement witnesses, conducting improper voir dire, misstating the law and minimizing the State's burden of proof, appealing to the jurors' passions and prejudices, arguing facts not in evidence, and disparaging the defense. We disagree.

To establish prosecutorial misconduct, a defendant bears the burden of proving the prosecutor's conduct was both improper and prejudicial. *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). If a defendant meets this burden, we may reverse the defendant's conviction. *State v. Emery*, 174 Wn.2d 741, 759-61, 278 P.3d 653 (2012). If a defendant establishes the prosecutor's conduct was improper, we must determine whether the defendant was prejudiced. 174 Wn.2d at 760. A defendant establishes prejudice when "'there is a substantial likelihood [that] the instances of misconduct affected the jury's verdict.'" *Thorgerson*, 172 Wn.2d at 443 (alteration in original) (quoting *State v. Magers*, 164 Wn.2d 174, 191, 189 P.3d 126 (2008)).

15

Where a defendant fails to object to alleged prosecutorial misconduct, he is deemed to have waived any error unless he shows the misconduct was so flagrant and ill-intentioned that an instruction from the trial court could not have cured the resulting prejudice. *Emery*, 174 Wn.2d at 760-61. To meet this heightened standard, the defendant must show that "(1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" 174 Wn.2d at 761 (quoting *Thorgerson*, 172 Wn.2d at 455).

In reviewing a prosecutor's comments during closing argument, we look to the context of the total argument, the issues presented in the case, the evidence addressed in the argument, and the jury instructions. *State v. Jackson*, 150 Wn. App. 877, 883, 209 P.3d 553 (2009). A prosecutor has wide latitude to draw reasonable inferences from the evidence and to express such inferences to the jury during closing argument. *State v. Warren*, 165 Wn.2d 17, 30, 195 P.3d 940 (2008).

A. *Vouching*

Jacobson argues that the prosecutor committed misconduct by vouching for law enforcement witnesses. Specifically, Jacobson argues that the prosecutor improperly vouched by stating that Jacobson, but not law enforcement, had a particular interest in the outcome of his case, the Task Force was successful in protecting children, and the jury must reach a unanimous decision. We disagree.

A prosecutor improperly vouches for a witness by expressing a personal belief in the veracity of a witness or arguing that evidence not presented at trial supports the witness's testimony. *Thorgerson*, 172 Wn.2d at 443. However, it is not improper for a prosecutor to draw

inferences from the evidence as to why the jury would want to believe one witness over the other. *Jackson*, 150 Wn. App. at 883. We will not find prejudicial error unless it is clear and unmistakable that the prosecutor was expressing a personal opinion. 150 Wn. App. at 883.

1. *Comparing Bias of Law Enforcement & Jacobson*

First, Jacobson argues that the prosecutor improperly vouched for law enforcement witnesses by stating that Jacobson, but not law enforcement, had a particular interest in the outcome of his case. We hold that the prosecutor's statements did not constitute vouching.

During closing argument, the prosecutor stated:

> [THE STATE]: I am going to suggest to you—one of the things the judge read you was an instruction that said you can consider any interest, bias or prejudice . . . . I would suggest that you apply that standard to the defendant particularly. Because if there is anyone who has an interest in the outcome of this case, it's him.
> [JACOBSON]: Objection, Your Honor. Objection to the statement of "particularly to the defendant."
> [THE STATE]: . . . I will clarify that.
> THE COURT: Sustained. . . .
> [THE STATE]: I am not saying weigh his testimony differently. I am encouraging you, asking you to apply the same standard you applied to [the law enforcement witnesses]. Apply the same exact standard.
> Ask yourself, what interest do they have in the outcome of this case? What bias? What prejudice? You've heard that they have done five or six operations and dealt with hundreds of these people and arrested 60-plus. What interest do they have in this particular case above any other case that they have investigated? What interest does [Jacobson] have? And why does he tell you folks a story that is 180 degrees different from what he said in the undercover capacity of the chats? And why is it completely different than what he told the detective? Why? It's because his testimony was not true.

5 VRP at 798-99. Jacobson did not object.

Taken in context, the prosecutor argued that the jury should infer from the evidence presented at trial that Jacobson was biased because of his personal interest in the case and, therefore, that his testimony was not credible to the extent that it conflicted with law

enforcement's testimony. The prosecutor then pointed out that no evidence suggested that law

enforcement had a similar personal interest in the case. Moreover, the prosecutor reminded the

jury that it should use the exact same standard to weigh the credibility of all the witnesses. As a

result, the prosecutor correctly stated the law, argued inferences from the evidence presented at

trial, and did not present his personal opinion. Accordingly, Jacobson fails to show that the

prosecutor vouched for law enforcement witnesses, and the prosecutor's conduct was not

improper. *See Jackson*, 150 Wn. App. at 884-85.

2. *Task Force Protecting Children*

Next, Jacobson argues that the prosecutor improperly vouched for law enforcement

witnesses by stating that the Task Force was successful in protecting children. We hold that the

prosecutor's statements did not constitute vouching.

The following exchange took place during the prosecutor's direct examination of

Sergeant Rodriguez:

> [THE STATE]: What is the purpose in general of the . . . Task Force with the State Patrol?
> [SERGEANT RODRIGUEZ]: So the purpose is to investigate cases dealing with child exploitation, to recover children—basically, keep people from doing harm to children.
> . . . .
> [THE STATE]: So in the [undercover operation], are you—are officers playing the roles of children?
> [SERGEANT RODRIGUEZ]: Yes.
> [THE STATE]: How is that helping to protect the children in general?
> [SERGEANT RODRIGUEZ]: Because when people are showing up to do something to a child, that's a child that they are not—you are keeping them from doing that to a child. In these operations, we have also identified or removed 18 kids. We have located children through these operations.

1 VRP at 132-33. Jacobson did not object.

The prosecutor continued:

[THE STATE]: By the way, are the [undercover operations] going to continue into next year?
[SEARGEANT RODRIGUEZ]: They will continue as long as I can do them.
[THE STATE]: Are you planning to do more of them?
[SERGEANT RODRIGUEZ]: Yes.
[THE STATE]: Have they been successful in what you've been intending to do with them?
[SERGEANT RODRIGUEZ]: Absolutely.

2 VRP at 390. Jacobson did not object.

Jacobson contends that the prosecutor improperly vouched for Sergeant Rodriguez because the prosecutor's questions dealt with the Task Force protecting children and the success of the Task Force's undercover operations. However, the prosecutor's questions revolved around the goal of the Task Force's undercover operations and whether that goal was being fulfilled. The prosecutor did not refer to Sergeant Rodriguez's credibility and did not suggest that the Task Force's success in protecting children impacted his veracity. Moreover, the prosecutor's questions did not express a personal belief in the truthfulness of Sergeant Rodriguez's testimony.

In addition, we note that Jacobson contends that the Task Force's alleged outrageous conduct deprived him of his right to due process. Yet here, Jacobson argues that the very evidence necessary to evaluate the Task Force's conduct, and whether its motive was to protect the public, constitutes improper vouching. Evidence of law enforcement's motive is necessary in reviewing undercover operations and is not improper on its face. Accordingly, the prosecutor did not vouch for Sergeant Rodriguez, and Jacobson fails to show that the prosecutor's statements were improper.

B.      *Conducting Improper Voir Dire*

Jacobson also argues that the prosecutor committed misconduct by conducting improper voir dire. Jacobson specifically argues that the prosecutor conducted improper voir dire by educating the jury about Craigslist, introducing evidence regarding the undercover operation, Backpage.com, and *To Catch a Predator* that would not be introduced at trial, and suggesting that the jury must reach a unanimous decision. The State argues that Jacobson waived any challenge to the prosecutor's questions during voir dire because Jacobson failed to object to the prosecutor's questions and because Jacobson accepted the jury as constituted. We disagree with the State but nevertheless hold that the prosecutor's statements do not constitute misconduct.

The purpose of voir dire is to enable the parties to learn the state of mind of the prospective jurors so as to determine whether any prospective jurors may be subject to a challenge for cause or the exercise of a peremptory challenge. *State v. Frederiksen*, 40 Wn. App. 749, 752, 700 P.2d 369 (1985). Jury voir dire should not be used to prejudice the jury for or against a party, to educate the jury as to the particular facts of the case, or to argue matters of law. 40 Wn. App. at 752.

1. *Waiver*

As an initial matter, the State argues that Jacobson waived any challenge to the prosecutor's questions during voir dire because Jacobson failed to object to the prosecutor's questions and accepted the jury as constituted. We disagree.

To support its argument, the State cites *State v. Elmore*, 139 Wn.2d 250, 985 P.2d 289 (1999). In *Elmore*, a capital defendant argued for the first time on appeal that the State's

20

questions during voir dire deprived him of reliable sentencing.[6] 139 Wn.2d at 277. The Washington Supreme Court determined that the defendant's argument was not properly raised on appeal because the defendant failed to object during voir dire and because the defendant accepted the jury as constituted and did not exhaust his peremptory challenges. 139 Wn.2d at 277. The court reasoned that voir dire is procedural, rather than constitutional, and cannot be raised for the first time on appeal. 139 Wn.2d at 277. In addition, the court determined that a defendant cannot show prejudice arising from the retention of a particular juror when he does not exercise all of his peremptory challenges and does not challenge the jury panel. 139 Wn.2d at 277-78.

Here, Jacobson did not object to the prosecutor's questions during voir dire. In addition, Jacobson did not exercise all of his peremptory challenges, and he did not challenge the jury panel.

Jacobson's argument is distinguishable from the challenge raised in *Elmore*. Although jury selection is procedural, prosecutorial misconduct affects a defendant's constitutional right to a fair trial. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 703-04, 286 P.3d 673 (2012). And *Elmore* did not involve a prosecutorial misconduct challenge. *See Elmore*, 139 Wn.2d at 277-78. As discussed above, a defendant may raise prosecutorial misconduct for the first time on appeal. Because Jacobson raises his prosecutorial misconduct challenges to voir dire for the first time on appeal, we determine whether the prosecutor's conduct during voir dire was flagrant and ill-intentioned, and we do not decline to address Jacobson's arguments only because he

---

[6] Elmore pleaded guilty, but he proceeded to trial on the penalty phase. *Elmore*, 139 Wn.2d at 262-63.

neither exhausted his peremptory challenges nor objected to the jury panel before trial. *Emery*, 174 Wn.2d at 760-61.

2. *Educating the Jury*

Jacobson argues that the prosecutor conducted improper voir dire by educating the jury about Craigslist. We hold that the prosecutor's statements were not improper.

During voir dire, the following exchange took place:

> [THE STATE]: . . . has anyone been into the Casual Encounter section of Craigslist? . . .
>> . . . .
>> [THE STATE]: . . . I am going to ask some questions about the Casual Encounter section of Craigslist which for those of you who have never heard of it has dating services, sex services, nudity, all kinds of stuff.

1 VRP at 11-12. Jacobson did not object.

The prosecutor continued:

> What would you expect when you hear the name Casual Encounters? Sound permanent? . . . Were you aware that you could find sex for sale on that website?
>> . . . .
>> . . . Anyone surprised or not surprised to know that you can actually pay for sex or, for that matter, get paid for sex on Craigslist?

1 VRP at 14-15. Jacobson did not object.

In response to a question regarding whether Craigslist should be responsible for the content posted on its website, a prospective juror stated, "[Craigslist has] a lot of recording capabilities where if you see inappropriate content, you flag it as inappropriate." 1 VRP at 16. The prosecutor then asked, "Does anybody know what happens when you flag the ad?" 1 VRP at 18. A prospective juror responded that when an ad is flagged, Craigslist will occasionally take it off of its website. The prosecutor continued: "Someone out there in the Internet reads the ad

and decides whether or not [the] complaint was legit. If it is, the ad is gone, and if it's not, it stays up." 1 VRP at 18. Jacobson did not object.

Later, the prosecutor stated:

What strikes me as one of my difficulties in this particular case is, is that—so one of the things I intend to do during this case is to present a detective who is going to walk people through the Craigslist Casual Encounter section, and I assure you it's going to be eyeopening. But I also am not surprised at all that not one person in here raised their hand when I said, "Have you been on the Casual Encounter section?" Because if you have, you are not going to raise your hand in a group full of people, especially that are all strangers, and say, "You know what? I saw a whole bunch of naked people who are offering sex for money, and oh, by the way, they were offering kids for sale, too," because it's kind of difficult to explain what you were doing there, right?
       I mean, it's not like you just happened to . . . . This is casual encounters where you have to click and it actually says, "Are you over 18 to go in here?" . . .
       . . . .
       . . . I am telling you, you have to say, "Yes, I am over 18." And you know how you do that? Click. And it's just that simple. So I guess then here—so here is the question: How do I find the people, the person, if there is any, the people who have been on the Casual Encounter section of Craigslist and don't want to talk about it? How do I do that?

1 VRP at 59-60. Jacobson did not object.

During voir dire, the prosecutor asked a number of questions about Craigslist and its functions, as well as the content of the Casual Encounters section on the website. Although these questions were related to facts that would be presented at trial, the prosecutor's questions did not educate the jury about the *particular* facts at issue. The prosecutor did not use voir dire to inform the jury of the nature of the Craigslist ad Jacobson responded to and did not suggest that the jury should be prejudiced against Jacobson because of his use of Craigslist. As a result, Jacobson fails to show that the prosecutor's conduct during voir dire was improper.

3. *Introducing Facts Not Presented at Trial*

Jacobson also argues that the prosecutor conducted improper voir dire by introducing evidence regarding the undercover operation, Backpage.com, and "To Catch a Predator" that would not be introduced at trial. Br. of Appellant at 28. We hold that the prosecutor's statements were not improper.

During voir dire, the prosecutor asked the prospective jurors: "So has anybody ever . . . actually been on Backpage.com? Heard of it? How many of you were aware of the recent news story that the CEO of Backpage was just arrested for running the largest online brothel in the world?" 1 VRP at 15. Jacobson did not object.

The prosecutor also asked, "How many of you watch shows like 20/20 and Dateline, those kind of things? . . . [D]id you ever watch the ones, *To Catch a Predator*, the stings that were done?" 1 VRP at 22. The prosecutor continued:

> *To Catch a Predator*, those kind of things, how many of you have watched the shows where they set somebody up; they show up, and it's the police and they are arrested? . . . Has anybody here ever seen one of those and thought to themselves, "God, I feel bad for that guy?"

1 VRP at 22. Jacobson did not object.

The prosecutor's questions regarding Backpage.com and "*To Catch a Predator*" did not pertain to facts particular to Jacobson's case, and the prosecutor did not use those questions to prejudice the jury against Jacobson. Instead, the prosecutor's questions were generalized inquiries about issues related to ads on Craigslist. It appears that the prosecutor asked these questions to ascertain the prospective jurors' points of view on these related issues and to determine whether any prospective jurors were subject to a challenge for cause or the use of a

peremptory challenge. Therefore, Jacobson fails to show that the prosecutor's questions regarding Backpage.com and "*To Catch a Predator*" were improper.

4. *Reaching a Unanimous Verdict*

Jacobson also argues that the prosecutor conducted improper voir dire by suggesting that the jury must reach a unanimous decision. We hold that Jacobson waived this issue on appeal because he fails to show that the prosecutor's conduct was flagrant and ill-intentioned.

Later during voir dire, the prosecutor asked:

> [THE STATE]: How many of you have actually sat on a jury that went all the way to the deliberations before?
> . . . .
> [THE STATE]: Has anyone sat on a jury that deliberated but then was not able to reach a verdict, so it was a hung jury? [Prospective juror]?
> PROSPECTIVE JUROR: Yes.
> [THE STATE]: Frustrating?
> PROSPECTIVE JUROR: Yes. . . .
> . . . .
> [THE STATE]: The goal of picking a jury is to try to pick a jury that's going to get along well enough to reach a unanimous decision. . . . So when [defense counsel] asks you at the end if there is anything we need to know about you, that kind of question, is there anybody here who doesn't play well with others that wants to admit it?

1 VRP at 54-55. Jacobson did not object.

We assume without deciding that the prosecutor's statements were improper. Nonetheless, the prosecutor's statements were not flagrant and ill-intentioned misconduct. The prosecutor's statement regarding the goal of a unanimous jury was isolated. In addition, the trial court instructed the jury that "you have a duty to discuss the case with one another and to deliberate in an effort to reach a unanimous verdict. . . . [You] should [not] change your mind just for the purpose of reaching a verdict." CP at 38. We presume that jurors follow the trial court's instructions. *Emery*, 174 Wn.2d at 766. As a result, Jacobson cannot show that the

prosecutor's comment had a substantial impact on the jury's verdict. Moreover, Jacobson fails to show that an instruction could not have cured any resulting prejudice. Therefore, Jacobson waived this issue on appeal.

C.     *Misstating the Law & Minimizing the State's Burden of Proof*

Jacobson also argues that the prosecutor committed misconduct by misstating the law and minimizing the State's burden of proof. Specifically, Jacobson argues that the prosecutor misstated the law by arguing that attempted first degree rape of a child and attempted commercial sexual abuse of a minor are similar crimes and by improperly analogizing that the charged crimes were like going "to the movies but being interrupted by a phone call." Br. of Appellant at 32. We hold that the prosecutor's statements were not improper.

"A prosecutor commits misconduct by misstating the law." *State v. Allen*, 182 Wn.2d 364, 373, 341 P.3d 268 (2015). A prosecutor's arguments that shift or misstate the State's burden to prove the defendant's guilt beyond a reasonable doubt also constitute misconduct. *State v. Lindsay*, 180 Wn.2d 423, 434, 326 P.3d 125 (2014).

1. *Similar Crimes*

Jacobson argues that the prosecutor misstated the law and minimized the State's burden of proof by arguing that attempted first degree rape of a child and attempted commercial sexual abuse of a minor are similar crimes. We hold that the prosecutor's argument was not improper.

"A person is guilty of rape of a child in the first degree when the person has sexual intercourse with another who is less than twelve years old and not married to the perpetrator and the perpetrator is at least twenty-four months older than the victim." RCW 9A.44.073(1). A person is guilty of commercial sexual abuse of a minor when the person "engage[s] in sexual

conduct with a minor in return for a fee." Former RCW 9.68A.100(1)(c) (2013). "Sexual

conduct" is defined as sexual intercourse, sexual contact, or both. Former RCW 9.68A.100(5).

During closing argument, the prosecutor stated:

> Rape of a Child First Degree, the completed crime, requires sex, and by that I mean sexual intercourse with a child under 12 not married to the defendant and more than 24 months younger.
> Commercial Sex Abuse of a Minor requires sexual conduct with a minor for a fee. So there is a lot of overlap between the two crimes. The age of the child; under 12 is a minor. Sexual contact, as you've just heard from the judge, is—sexual conduct is described as sexual intercourse or sexual contact. . . .
> Both of those two things, sexual intercourse and sexual contact, equal sexual conduct. So the only difference really between the completed crime is the element of "for a fee." . . .
> . . . .
> So attempt to commit a crime, I am going to talk about those crimes together again because the elements are so similar. For Attempted Rape of a Child 1, it's intent to commit the crime, a substantial step. For Commercial Sex Abuse of a Minor, it's intent to commit the crime, a substantial step.

5 VRP at 781-83. Jacobson did not object.

The prosecutor's statements regarding first degree rape of a child and commercial sexual

abuse of a minor did not amount to misstatements of the law. The prosecutor explained that the

elements of the two crimes are similar and distinguished those elements. Moreover, the

prosecutor's statements did not involve the State's burden of proof. Accordingly, Jacobson fails

to show that the prosecutor's statements were improper.

2. *Improper Analogy*

Jacobson also argues that the prosecutor misstated the law and minimized the State's

burden of proof by arguing that attempted first degree rape of a child and attempted commercial

sexual abuse of a minor are like "go[ing] to the movies but being interrupted by a phone call."

Br. of Appellant at 32. We hold that the prosecutor's statements were not improper.

The trial court instructed the jury that a "substantial step" is "conduct that strongly indicates a criminal purpose and which is more than mere preparation." CP at 32. During closing argument, the prosecutor provided:

> So attempt to commit a crime, I am going to talk about those crimes again together because the elements are so similar. . . .
> One of those elements isn't or shouldn't be disputed, and that is the element of a substantial step. . . .
> . . . .
> If you put it in real-world terms, since none of you have been in a scenario like this defendant was in, if you put it in real-world terms, if you get together with your spouse or your children and you talk about going to a movie and you decide what movie you're going to go to, what theater you're going to go to, what time the movie is going to be, and then you get in your car and you drive to the movie; you have your money; you get some candy because you are not going to pay that kind of price at the movie theater and it's in your pocket; you get to the movie theater and the phone rings and you get called away and you can't go, did you intend to see a movie? That's what the law criminalizes in the attempted commission of a crime, a substantial step.

5 VRP at 782-84. Jacobson did not object.

Jacobsen mischaracterizes the prosecutor's argument. The prosecutor did not equate the crimes to going to the movies but rather was specifically attempting to illustrate the term "substantial step." The prosecutor properly stated that taking a substantial step is an element of attempt. The prosecutor then used his movie analogy to give context to the term. The prosecutor's analogy conveyed that a substantial step required more than mere preparation and could be satisfied when conduct strongly indicated that a person intended to commit the act in question. The prosecutor's statements did not minimize the fact that the jury was required to find Jacobson guilty beyond a reasonable doubt. As a result, Jacobson fails to show that the prosecutor's statements were improper.

28

D.      *Appealing to Jurors' Passions & Prejudices*

Jacobson also argues that the prosecutor committed misconduct by appealing to the jurors' passions and prejudices during closing argument. Specifically, Jacobson argues that the prosecutor appealed to the jurors' passions and prejudices by arguing that the jury should "hold Jacobson responsible," discussing the "filth" on Craigslist, and suggesting that one who discusses having sex with a child is willing to have sex with a child. Br. of Appellant at 34-35. We disagree.

Prosecutors commit misconduct when they use arguments designed to arouse the passions or prejudices of the jury. *Glasmann*, 175 Wn.2d at 704. Arguments designed to arouse the jury's passions or prejudices create a danger that the jury may convict for reasons other than the evidence. *See State v. Ramos*, 164 Wn. App. 327, 338, 263 P.3d 1268 (2011). Despite this, a prosecutor is not muted because the acts committed arouse natural indignation. *State v. Pierce*, 169 Wn. App. 533, 552, 280 P.3d 1158 (2012). A prosecutor is not barred from referring to the heinous nature of a crime but nevertheless retains the duty to ensure a verdict free from prejudice. 169 Wn. App. at 553.

1. *Holding Jacobson Responsible*

Jacobson argues that the prosecutor appealed to the jurors' passion and prejudices by arguing that the jury should "hold Jacobson responsible." Br. of Appellant at 33. We hold that the prosecutor's statements were not improper.

During rebuttal argument, the prosecutor stated:

> [THE STATE]: [Jacobson] decided to have sex with an 11-year-old girl, and he decided he was going to pay for it to accomplish it. And now it's up to you folks to hold him responsible for what he did.
> [JACOBSON]: Objection. That's not what they are supposed to be doing.

29

> THE COURT: Overruled. . . .
> [THE STATE]: When the evidence is there, beyond a reasonable doubt, the just verdict is also what holds the defendant responsible and that's a verdict of guilty as charged.

5 VRP at 829. Jacobson did not object to the prosecutor's last statement.

Viewing the prosecutor's statements in context and in light of the entire argument, the prosecutor argued that the evidence supported a guilty verdict. Stated another way, the prosecutor argued that the jury should hold Jacobson responsible and return guilty verdicts because the evidence showed beyond a reasonable doubt that Jacobson committed the crimes charged. As a result, the prosecutor argued that the jury should render a conviction based on the evidence. Consequently, the prosecutor did not urge the jury to convict Jacobson for reasons other than the evidence presented at trial, and the prosecutor's statements were not designed to arouse the jurors' passions and prejudices. Accordingly, Jacobson fails to show that the prosecutor's statements were improper.

2. *Discussing the "Filth" on Craigslist*

Jacobson also appears to argue that the prosecutor appealed to the jurors' passion and prejudices by discussing the "filth" on Craigslist. We hold that Jacobson waived this issue on appeal because he fails to show that the prosecutor's conduct was flagrant and ill-intentioned.

During opening argument, the prosecutor provided:

> The advertisements that [the Task Force is] using now are on Craigslist, and they are in the Casual Encounter section. . . .
> The Casual Encounter section of Craigslist is filth like almost no other. . . .
> . . . .
> Sergeant Rodriguez will tell you about some of the advertisements that they have come across when they do these operations because not only does Sergeant Rodriguez post the advertisements, but while he is responding to people who are responding to him, he is also looking up other ads, people who are offering up children, people who are offering up acts of bestiality, with animals, people offering

up all kinds of stuff you cannot believe, and the filthier the better in some respects. And you'll see, as Sergeant Rodriguez walks you through Craigslist, the different type of advertisements.

1 VRP at 120-21. Jacobson did not object.

Later during opening argument, the prosecutor stated, "I am going to also apologize in advance for some of the evidence and some of the things you are going to see in this case because they are offensive content. Unfortunately, it's the defendant's actions that are bringing us here today." 1 VRP at 125-26. Jacobson did not object.

It was improper for the prosecutor to suggest that Jacobson's actions were the reason why the jury would hear evidence about bestiality and other "filthy" content on Craigslist. However, Jacobson does not argue that the prosecutor's statements had a substantial likelihood of affecting the jury's verdict, and he does not show that no instruction could cure any resulting prejudice. The prosecutor's statements were brief and made in isolation. At trial, the jury heard evidence regarding the content on Craigslist and the text messages between Jacobson and Kristl, and the trial court instructed the jury that "[y]ou must reach your decision based on the facts proved to you and on the law given to you, not on sympathy, prejudice, or personal preference." CP at 25. Accordingly, Jacobson waived this issue on appeal because he fails to show that the prosecutor's statements were flagrant and ill-intentioned.

3. *Suggesting Guilt*

Jacobson also argues that the prosecutor appealed to the jurors' passions and prejudices by suggesting that one who discusses having sex with a child is willing to have sex with a child. We hold that Jacobson waived this issue on appeal because he fails to show that the prosecutor's conduct was flagrant and ill-intentioned.

31

During closing argument, the prosecutor stated:

> So what is important in this case is, what did the defendant know when he was having his conversations and when he drove over to this house?
>
> A lot of our law is a gray area. There aren't many things that are black or white, one or the other, but I am going to suggest to you that there is one thing that is black and white, and that's this: An adult will either have sex with a child or will not. There isn't any gray area there. An adult either will or will not.
>
> And I am going to go a little bit further than that and say that an adult that is willing to talk about having sex with a child falls into the category of an adult who will because there isn't any adult in our society to whom the idea of sex with a child is repulsive, who will talk about having sex with a child. That doesn't happen in the real world.
>
> This defendant clearly was willing to talk about having sex with a child. He pursued that topic over the course of three dates. He saw it out and then he drove to the place where he thought it was going to happen, and that's what makes him guilty of both of these crimes.

5 VRP at 786-87. Jacobson did not object.

The prosecutor's argument suggested that because rape of a child is so repulsive, anyone who discusses having sex with a child will have sex with a child. The prosecutor then argued that because Jacobson discussed having sex with a child, the jury should infer that he would have sex with a child. The prosecutor's arguments did not refer to the specific evidence that demonstrated Jacobson's intent to commit attempted first degree rape of a child and suggested that the jury should convict Jacobson for reasons outside of the evidence presented at trial. As a result, the prosecutor argued facts outside of the evidence, and his arguments were designed to arouse the jurors' passions and prejudices. Thus, these arguments were highly improper.

Despite this, Jacobson fails to show that there is a substantial likelihood that the prosecutor's arguments affected the jury's verdict. The prosecutor later argued how evidence presented at trial showed that Jacobson was guilty of the charged crimes: Jacobson met at the agreed upon gas station at the agreed upon time and brought condoms, lubricant, and candy.

Moreover, the trial court instructed the jury that it must disregard any statement or argument that was not supported by the evidence, and we presume that jurors follow the trial court's instructions. *Emery*, 174 Wn.2d at 766. And the prosecutor reminded the jury that it was Jacobson's actions that supported a guilty verdict. Accordingly, Jacobson fails to show that no instruction could cure any resulting prejudice. Therefore, Jacobson waived this issue on appeal because he fails to show that the prosecutor's conduct was flagrant and ill-intentioned.

E.      *Arguing Facts Not in Evidence*

Jacobson also argues that the prosecutor committed misconduct by arguing facts not in evidence. Specifically, Jacobson argues that the prosecutor argued facts not in evidence by stating that Jacobson was arrested before he arrived at the trap house to avoid a dangerous situation.[7] We hold that the prosecutor's statement was not improper.

A prosecutor commits misconduct by arguing facts not in evidence. *Glasmann*, 175 Wn.2d at 705. However, a prosecutor is permitted to draw reasonable inferences from the evidence.

At trial, Sergeant Rodriguez stated that he did not feel comfortable having Knoll act in an undercover capacity because she had not received any undercover training. Sergeant Rodriguez stated that there were safety concerns in sending Knoll to meet Jacobson, so he was not going to

---

[7] Jacobson also appears to argue that the prosecutor improperly stepped in Jacobson's shoes and attributed thoughts to Jacobson. Jacobson's argument is conclusory and does not provide a reasoned analysis of how the prosecutor's statements constituted misconduct. Accordingly, we do not consider this argument. RAP 10.3(a)(6); *State v. Mason*, 170 Wn. App. 375, 384, 285 P.3d 154 (2012) ("We do not consider conclusory arguments unsupported by citation to authority.").

have her leave the trap house. Sergeant Rodriguez also testified that Gasser looked too old to

leave the trap house and meet Jacobson.

During closing argument, the prosecutor stated:

And [the crime] was completed when [Jacobson] left the gas station and drove on his way to the residence before getting pulled over.
    The only reason that he got pulled over before he got to the house and walked in—because you heard Sergeant Rodriguez talk about, "We let them in with the undercover officer, tell them to take their shoes off, and we arrest them and we videotape that."
    That couldn't happen in this case because there wasn't a little girl, and this defendant was cautious. This defendant wanted to put eyes on that little girl. And the officers weren't going to take a chance of him pulling into Yakima Street, [Knoll] going outside without a child and having him take off and get into a more dangerous situation.

5 VRP at 784. Jacobson did not object.

Sergeant Rodriguez's testimony established that there were safety concerns in allowing

Knoll and Gasser to meet Jacobson either at the gas station or at the trap house. The prosecutor

then inferred from the evidence that a more dangerous situation could occur if law enforcement

permitted Jacobson to enter the trap house. As a result, Jacobson fails to show that the

prosecutor argued facts not in evidence and that the prosecutor's statements were improper.

F.    *Disparaging the Defense*

Jacobson also argues that the prosecutor committed misconduct by disparaging the

defense.[8] Jacobson specifically argues that the prosecutor disparaged the defense by arguing that

---

[8] Jacobson also argues in passing that the prosecutor committed misconduct during his cross-examination of Jacobson. However, Jacobson does not argue why the prosecutor's conduct constituted misconduct and does not provide any citation to authority. Accordingly, we do not consider Jacobson's argument. RAP 10.3(a)(6); *Mason*, 170 Wn. App. at 384.

Jacobson's explanation for his response to the Craigslist ad was "BS." Br. of Appellant at 40. This court should hold that the prosecutor's statement was not improper.

It is misconduct for a prosecutor to disparagingly comment on defense counsel's role or impugn defense counsel's integrity. *Thorgerson*, 172 Wn.2d at 451. However, prosecutors may properly argue that the evidence does not support the defense's theory of the case. 172 Wn.2d at 465.

At trial, Jacobson testified that when he responded to the Task Force's Craigslist ad, he believed he was agreeing to meet with an adult woman who would act like an 11-year-old girl. Jacobson testified that he believed the term "no RP" in the Craigslist ad meant "no real people." 4 VRP at 567.

During closing argument, the prosecutor stated,

> Let me say at the outset of this that I am going to use the word "I" multiple times in this closing argument. It is not my personal opinion. My personal opinion has no place in this case. So when I use the word "I," I am not telling you what to think. I am telling you what the evidence shows and what the law shows.

5 VRP at 780. The prosecutor then responded to Jacobson's trial testimony:

> It wasn't enough for the defendant that he got a picture of Lisa. He then asked—and I am going to suggest to you that when the defendant's cross-examination went worse for him was when he tried to explain to you why he needed a picture of the mom and the girl together because if the mom is pretending to be the girl, that's not possible. . . .
> He then wanted the girl brought to the gas station with the mother so he could put eyes on them and determine they were real.
> I am going to suggest to you that the defendant's explanation of what "no RP" means was a couple of other initials, one of which is a B. But you know what? BS. It's not possible that "no RP" means no real person.
> . . . .
> But the point is that the no RP, the no real people, the no role play, all of that is a sidetrack to what was actually going on here because the defendant's words and actions are what demonstrated his intent.

5 VRP at 791-92. Jacobson did not object.

Although the prosecutor's statement that Jacobson's explanation of the meaning of "no RP" was strong, the statement was not a comment on defense counsel's role and did not impugn defense counsel's integrity. Instead, the prosecutor permissibly argued that the evidence presented at trial, and not his personal opinion, did not support Jacobson's testimony. It is not improper for a prosecutor to argue that evidence does not support the defense's theory. *Thorgerson*, 172 Wn.2d at 465. Accordingly, Jacobson fails to show that the prosecutor's statements were improper.

### III. CUMULATIVE ERROR

Jacobson argues that the cumulative effect of the prosecutor's alleged misconduct deprived him of a fair trial. We disagree.

The cumulative error doctrine applies when a trial is affected by "several trial errors that standing alone may not be sufficient to justify reversal but when combined may deny a defendant a fair trial." *State v. Greiff*, 141 Wn.2d 910, 929, 10 P.3d 390 (2000). To determine whether cumulative error requires reversal of a defendant's conviction, we must consider whether the totality of circumstances substantially prejudiced the defendant. The totality of the circumstances do not substantially prejudice the defendant where the evidence is overwhelming against the defendant. *In re Pers. Restraint of Cross*, 180 Wn.2d 664, 691, 327 P.3d 660 (2014). Additionally, the cumulative error doctrine does not apply when there are no errors or where the errors are few and have little or no effect on the trial's outcome. *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006).

As discussed above, Jacobson identifies three trial errors—the prosecutor's improper suggestion that one who discusses having sex with a child is willing to have sex with a child, improper statement that the jury must reach a unanimous decision, and improper discussion regarding the filth on Craigslist. Considering these errors together, Jacobson fails to show that their combined effect deprived him of a fair trial. The prosecutor's remarks had little to no effect on the outcome of Jacobson's trial because they were brief and made in isolation. The trial court instructed the jury that it must reach its decision based on the evidence and that it should disregard any of the prosecutor's statements that were not supported by the evidence.

Moreover, overwhelming evidence supports Jacobson's convictions. Jacobson exchanged a number of text messages with undercover officers and clearly stated that he wished to have both oral and vaginal intercourse with an 11-year-old girl, Lisa. Jacobson asked for several pictures of Lisa, and he agreed to provide a gift card as compensation for having sexual contact with Lisa. In addition, Jacobson drove to the agreed upon gas station before he was to meet Lisa. Jacobson was arrested outside the gas station with condoms, lubricant, and candy on his person—as the undercover officers requested.

Looking to the errors in the context of the entire record, we conclude that Jacobson failed to meet his burden in proving that the cumulative effect of the prosecutor's statements substantially prejudiced him and thus deprived him of a fair trial.

IV. SUFFICIENCY OF THE EVIDENCE

Jacobson also argues that insufficient evidence supports his convictions for attempted first degree rape of a child and attempted commercial sexual abuse of a minor. We disagree.

A challenge to the sufficiency of the evidence to convict is a constitutional question that we review de novo. *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). To determine whether sufficient evidence supports a defendant's conviction, we must consider whether any rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt. 184 Wn.2d at 903. We must draw all reasonable inferences from the evidence in favor of the State and interpret them strongly against the defendant. *State v. Brown*, 162 Wn.2d 422, 428, 173 P.3d 245 (2007). We consider circumstantial evidence and direct evidence as equally reliable. *State v. Bowen*, 157 Wn. App. 821, 827, 239 P.3d 1114 (2010).

A.     *Attempted First Degree Rape of a Child*

Jacobson argues that insufficient evidence supports his conviction for attempted first degree rape of a child because the State failed to prove that Jacobson attempted to have sexual intercourse with a child under the age of 12. We disagree.

To convict a defendant of attempted first degree rape of a child, the State must prove beyond a reasonable doubt that the defendant intended to have sexual intercourse and took a substantial step toward having sexual intercourse with a child under the age of 12. RCW 9A.28.020(1), 9A.44.073(1); *State v. Wilson*, 1 Wn. App. 2d 73, 83, 404 P.3d 76 (2017). A substantial step is conduct strongly corroborative of the defendant's criminal purpose. *State v. Wilson*, 158 Wn. App. 305, 317, 242 P.3d 19 (2010). Mere preparation to commit a crime is not a substantial step toward the commission of that crime. 158 Wn. App. at 317. However, "Any slight act done in furtherance of a crime constitutes an attempt if it clearly shows the design of the individual to commit the crime." *State v. Price*, 103 Wn. App. 845, 852, 14 P.3d 841 (2000).

Here, Jacobson engaged in a text message exchange with Kristl after responding to the Task Force's Craigslist ad. Kristl said that her daughter, Lisa, was "[e]leven, nearly 12." 2 VRP at 257. Jacobson asked for photographs of Lisa and stated, "I believed we were talking about Lisa being ready to go all the way. And if she is and you are comfortable with that, then I would like to help with that." 2 VRP at 278. Jacobson also stated that he was interested in oral sex.

Jacobson and Kristl arranged to meet at a gas station before Jacobson would meet with Lisa. Kristl also asked that Jacobson bring condoms, lubricant, and candy. Jacobson was arrested outside of the agreed upon gas station and had condoms, lubricant, and candy on his person.

Jacobson argues that the State failed to prove that he intended to have sexual intercourse with a child under the age of 12 because Lisa's age was ambiguous. Jacobson contends that because Kristl did not correct him when he stated that Lisa was 12 and because he was sent pictures of Gasser that were taken when she was approximately 16, it was not clear that Lisa was under the age of 12. We hold that Jacobson's argument is unpersuasive.

We draw all reasonable inferences from the evidence in a light most favorable to the State. *Brown*, 162 Wn.2d at 428. At trial, the State introduced a text message in which Kristl states that Lisa is "[e]leven, nearly 12." 2 VRP at 257. A juror could reasonably conclude beyond a reasonable doubt from this text message that Jacobson intended to have sexual intercourse with an 11-year-old.

Moreover, when viewing the evidence in the light most favorable to the State, the jury could find beyond a reasonable doubt that Jacobson intended to have sexual intercourse with an 11-year-old and took a substantial step toward the commission of the crime of first degree child

rape. The evidence established that Jacobson requested to have oral and vaginal sex with Lisa. Jacobson asked for photographs of Lisa, agreed on a meeting place, drove to the agreed upon meeting place, and brought condoms and lubricant. These actions strongly corroborate Jacobson's intent to commit the crime of first degree child rape. Therefore, substantial evidence supports Jacobson's conviction for attempted first degree rape of a child.

B.      *Attempted Commercial Sexual Abuse of a Minor*

Jacobson also argues that insufficient evidence supports his conviction for attempted commercial sexual abuse of a minor. Jacobson contends that sufficient evidence does not support each alternative means of committing attempted commercial sexual abuse of a minor and that there was no evidence that a "fee" was at issue. Br. of Appellant at 52. We disagree.

Former RCW 9.68A.100 provides:

(1) a person is guilty of commercial sexual abuse of a minor if:
        (a) He or she pays a fee to a minor or a third person as compensation for a minor having engaged in sexual conduct with him or her;
        (b) He or she pays or agrees to pay a fee to a minor or a third person pursuant to an understanding that in return therefore such minor will engage in sexual conduct with him or her; or
        (c) He or she solicits, offers, or requests to engage in sexual conduct with a minor in return for a fee.

To prove that a defendant attempted to commit a crime, the State must show beyond a reasonable doubt that "with intent to commit a specific crime, he or she does any act which is a substantial step toward the commission of that crime." RCW 9A.28.020(1). As a result, to prove that a defendant committed attempted commercial sexual abuse of a minor, the State must show that a defendant (1) intended the criminal result and (2) took a substantial step toward accomplishing that result.

As an initial matter, both parties appear to assert that commercial sexual abuse of a minor is an alternative means crime. We assume without deciding that this is true. However, the trial court instructed the jury that a person commits the crime of commercial sexual abuse of a minor when "he pays or agrees to pay a fee to a minor or a third person pursuant to an understanding that in return for the fee the minor will engage in sexual conduct with him solicits, offers, or requests to engage in sexual conduct with a minor in return for a fee." CP at 35. Accordingly, we must determine whether substantial evidence supports both that Jacobson attempted to engage in sexual conduct with a minor in return for a fee and that Jacobson attempted to solicit, offer, or request to engage in sexual conduct with a minor in return for a fee.

Jacobson and Kristl arranged for Jacobson to meet Lisa, Kristl's 11-year-old daughter. Jacobson expressed that he wanted to have oral and vaginal sex with Lisa. During a text message exchange, Kristl asked Jacobson if he was okay with gifts. Jacobson asked, "What does [Lisa] like?" 2 VRP at 284. Kristl responded, "Roses are always good. She likes gift cards, track phone minutes for her phone, stuff like that. Is that okay?" 2 VRP at 284. Jacobson answered in the affirmative.

On the day that Jacobson and Kristl agreed to meet, Kristl asked Jacobson what gifts he planned on bringing. Jacobson stated: "A gift card? That can be used for any purpose." 2 VRP at 325. Jacobson and Kristl did not discuss the exact amount that would be placed on the gift card. Jacobson and Kristl agreed to meet at a gas station before Jacobson could meet with Lisa. Jacobson was arrested outside of the agreed upon gas station. During a search incident to Jacobson's arrest, law enforcement located condoms and lubricant.

41

Jacobson argues that the State failed to prove that he intended to have sexual contact with a minor in exchange for a fee because the State did not present evidence that a fee was at issue. We disagree. Although Jacobson and Kristl did not agree on a fixed sum to be placed on the gift card, Jacobson's offer and assent to provide a gift card demonstrated his intent to provide a fee in return for engaging in sexual conduct with Lisa and was a substantial step toward accomplishing that result.

Viewing the evidence in a light most favorable to the State, we conclude that a rational trier of fact could find the essential elements of both alternative means of attempted commercial sexual abuse of a minor beyond a reasonable doubt. Jacobson requested to have both vaginal and oral sex with Lisa, an 11-year-old. In addition, Jacobson agreed to provide a gift card to Kristl in exchange for his sexual conduct with Lisa. Jacobson's conduct in driving to the agreed upon meeting place and having condoms and lubricant on his person strongly corroborates his intent to engage in sexual conduct with Lisa and to provide a gift card as compensation, as agreed. Accordingly, Jacobson took a substantial step toward the commission of attempted commercial sexual abuse of a minor, and substantial evidence supports both alternative means of that crime.

## V. COMMUNITY CUSTODY CONDITIONS

Jacobson also argues that the trial court's prohibition against accessing the Internet without approval of his community custody officer and against using a device with Internet access violates his First Amendment rights. We disagree.

Generally, imposing community custody conditions is within the discretion of the sentencing court and will be reversed if manifestly unreasonable. *State v. Sanchez Valencia*, 169

Wn.2d 782, 791-92, 239 P.3d 1059 (2010). The imposition of an unconstitutional community custody condition is manifestly unreasonable. 169 Wn.2d at 792.

A defendant's constitutional rights while on community custody are subject to the infringements authorized by Washington's Sentencing Reform Act (SRA), chapter 9.94A RCW. *State v. Riles*, 135 Wn.2d 326, 347, 957 P.2d 655 (1998). Under the SRA, a trial court may require that a defendant comply with crime-related prohibitions. RCW 9.94A.505(9), .703(3)(f). In addition, a trial court may prohibit a defendant's access to a means or medium through which he committed a crime. *In re Pers. Restraint of Rainey*, 168 Wn.2d 367, 380, 229 P.3d 686 (2010). A condition restricting a defendant's First Amendment rights must be reasonably necessary to accomplish the essential needs of the State and public order and be sensitively imposed. *State v. Bahl*, 164 Wn.2d 739, 757, 193 P.3d 678 (2008).

The trial court imposed community custody provisions and ordered that Jacobson refrain from "internet access or use, including email, without the prior approval of the supervising CCO." Suppl. CP at 88. The trial court also ordered:

> No use of a computer, phone, or computer-related device with access to the Internet or on-line computer service except as necessary for employment purposes (including job searches). The CCO is permitted to make random searches of any computer, phone or computer-related device to which the defendant has access to monitor compliance with this condition.

Suppl. CP at 88.

Here, the conditions prohibiting access to the Internet and the use of a device with access to the Internet were reasonably necessary to accomplish the essential needs of the State and public order, and the conditions were sensitively imposed. Jacobson's crimes were committed through the use of the Internet, where he found and responded to a Craigslist ad that facilitated

his arrangement to have sexual contact with an 11-year-old girl. Prohibiting Jacobson from accessing the Internet, and using devices with Internet access, is reasonably necessary to prevent repeated offenses. Without access to the Internet, Jacobson is unable to access similar ads and communicate to make additional arrangements. Moreover, the community custody conditions do not impose a blanket prohibition of Internet use. Jacobson may access the Internet with the permission of his community custody officer. Accordingly, the trial court did not improperly infringe on Jacobson's First Amendment rights by prohibiting his use of the Internet and devices with Internet access.

We affirm Jacobson's convictions and sentence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Worswick, P.J.

We concur:

_____
Bjorgen, J.

_____
Sutton, J.